1  Vanessa R. Waldref
2  United States Attorney
   Eastern District of Washington
3  Stephanie Van Marter
   Assistant United States Attorney
4  Post Office Box 1494
5  Spokane, WA 99210-1494
   Telephone: (509) 353-2767
6

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAY 18 2023

SEAN F. McAVOY, CLERK
_____DEPUTY
RICHLAND, WASHINGTON

7           UNITED STATES DISTRICT COURT
8         FOR THE EASTERN DISTRICT OF WASHINGTON

9  UNITED STATES OF AMERICA,

10              Plaintiff,                 Case No 4:22-CR-6032-MKD-1

11                                         Plea Agreement
           v.
12

13  ANTONIO ZAMORA-ZARAZOGA,

14              Defendant.

15

16

17      Plaintiff United States of America, by and through Vanessa R. Waldref,

18  United States Attorney the Eastern District of Washington, and Stephanie Van

19  Marter, Assistant United States Attorney for the Eastern District of Washington,

20  and Defendant Antonio Zamora-Zaragoza ("Defendant"), both individually and by

21  and through Defendant's counsel, Craig Webster, agree to the following Plea

22  Agreement.

23      1.    Guilty Plea and Maximum Statutory Penalties

24      Defendant agrees to enter a plea of guilty to Count 3 of the Indictment filed

25  on July 6, 2022, which charges Defendant with Distribution of 50 Grams of Actual

26  (Pure) Methamphetamine, in violation of 21 U.S.C. § § 841(a)(1),(b)(1)(A)(viii), a

27  Class A felony.

28

PLEA AGREEMENT - 1

Defendant understands that the following potential penalties apply:

    a.    a term of imprisonment of not less than 10 years and up to a lifetime;

    b.    a term of supervised release of not less than 5 years and up to a lifetime;

    c.    a fine of up to $250,000;

    d.    a $100 special penalty assessment.

2.    <u>Supervised Release</u>

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, up to the following terms:

    a.    5 years in prison if the offense that resulted in the term of Supervised Release is a class A felony,

    b.    3 years in prison if the offense that resulted in the term of Supervised Release is a class B felony, and/or

    c.    2 years in prison if the offense that resulted in the term of Supervised Release is a class C felony.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3.    <u>The Court is Not a Party to this Plea Agreement</u>

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

PLEA AGREEMENT - 2

Defendant understands the following:

    a.    sentencing is a matter solely within the discretion of the Court;

    b.    the Court is under no obligation to accept any recommendations made by the United States or Defendant;

    c.    the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

    d.    the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

    e.    the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

    f.    the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

4.    <u>Potential Immigration Consequences of Guilty Plea</u>

If Defendant is not a citizen of the United States, Defendant understands the following:

    a.    pleading guilty in this case may have immigration consequences;

    b.    a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

    c.    removal from the United States and other immigration consequences are the subject of separate proceedings; and

    d.    no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

PLEA AGREEMENT - 3

1    Defendant affirms that Defendant is knowingly, intelligently, and voluntarily
2    pleading guilty as set forth in this Plea Agreement, regardless of any immigration
3    consequences that Defendant's guilty plea may entail.

4        5.    Waiver of Constitutional Rights

5    Defendant understands that by entering this guilty plea, Defendant is
6    knowingly and voluntarily waiving certain constitutional rights, including the
7    following:

8            a.    the right to a jury trial;
9            b.    the right to see, hear and question the witnesses;
10           c.    the right to remain silent at trial;
11           d.    the right to testify at trial; and
12           e.    the right to compel witnesses to testify.

13   While Defendant is waiving certain constitutional rights, Defendant
14   understands that Defendant retains the right to be assisted by an attorney through
15   the sentencing proceedings in this case and any direct appeal of Defendant's
16   conviction and sentence, and that an attorney will be appointed at no cost if
17   Defendant cannot afford to hire an attorney.

18   Defendant understands and agrees that any defense motions currently
19   pending before the Court are mooted by this Plea Agreement, and Defendant
20   expressly waives Defendant's right to bring any additional pretrial motions.

21       6.    Elements of the Offense

22   The United States and Defendant agree that in order to convict Defendant of
23   Distribution of 50 Grams of Actual (Pure) Methamphetamine, in violation of 21
24   U.S.C. § § 841(a)(1),(b)(1)(A)(viii), the United States would have to prove the
25   following beyond a reasonable doubt.

26           a.    *First,* on or about March 4, 2022, in the Eastern District of
27                   Washington, the Defendant did knowingly distributed a mixture
28                   or substance containing a detectable amount of

PLEA AGREEMENT - 4

1   methamphetamine;

2       b.    Second, the Defendant knew that it was methamphetamine or

3            some other prohibited drug; and

4       c.    *Third*, the Defendant distributed 50 grams or more of actual

5            (pure) methamphetamine.

6       7.    <u>Factual Basis and Statement of Facts</u>

7       The United States and Defendant stipulate and agree to the following: the

8   facts set forth below are accurate; the United States could prove these facts beyond

9   a reasonable doubt at trial; and these facts constitute an adequate factual basis for

10  Defendant's guilty plea.

11      The United States and Defendant agree that this statement of facts does not

12  preclude either party from presenting and arguing, for sentencing purposes,

13  additional facts that are relevant to the Sentencing Guidelines computation or

14  sentencing, unless otherwise prohibited in this Plea Agreement.

15      In or around May 2021, DEA Richland while utilizing a confidential source

16  (hereafter CS1), identified a Mexico-based Drug Trafficking Organization

17  ("DTO") that had ties to the Tri-Cities and Olympia areas of Washington State and

18  California. CS1 identified one of the members of this DTO as Defendant, Antonio

19  ZAMORA-Zaragoza. CS1 advised they knew Defendant as "Toni" and that he

20  resided in Kennewick, Washington. TFO Slocombe was able to corroborate this

21  information and identified through surveillance, a residence being utilized by

22  Defendant (30 North Sheppard Place, Apartment 7, Kennewick Washington

23  (Benton County)).

24      CS1 further advised that Defendant, in connection with this DTO, was

25  responsible for distributing pound-level quantities of methamphetamine and further

26  admitted to having purchased drugs from Defendant previously. CS1 further

27  identified a possible stash house locations and a storage unit the DTO utilized to

28  facilitate their activities. CS1 provided a cell phone number for Defendant and

PLEA AGREEMENT - 5

1   positively identified him from a Washington State driver's license photograph.

2       Prior to May 17, 2021, CS1, under TFO Slocomb's direction, contacted

3   Defendant and asked to buy one pound of methamphetamine.  Defendant told CS1

4   that he was out of supply and was waiting for more drugs from his source of

5   supply.  On or about May 17, 2021, CS1 advised Defendant contacted CS1 to state

6   that Defendant's source of supply was on the way to Defendant's address, and

7   would be arriving within a few hours.

8       Based upon that information, DEA set up surveillance at Defendant's

9   residence and identified a Hispanic female, possibly Defendant's source of supply,

10  arrive at the residence.  The female was observed removing what appeared to be a

11  heavy black plastic style grocery bag from the rear passenger seat of her vehicle

12  and taking it to Defendant's apartment.

13      During the above referenced surveillance, SA Deitering saw, and video

14  recorded the female, Defendant, and an unknown woman walk down the stairs

15  from the area of Defendant 's apartment.  SA Deitering saw that the female was no

16  longer carrying the black grocery bag.  The group walked over to the trunk of her

17  vehicle, where the unknown woman then placed unidentifiable items into the trunk.

18  The group then walked southbound out of the area and returned a short time later,

19  with a school aged child.  The group split up with Defendant and his female

20  companions getting into one vehicle and the possible female source, getting into

21  her vehicle.  The vehicles then drove out of the area.

22      Three days after the above-described meeting between Defendant and the

23  potential source, CS1, under my direction, arranged with Defendant to purchase

24  one pound of methamphetamine.

25      CONTROLLED BUY ONE

26      On or about May 20, 2021, SA Deitering and TFO Slocombe met CS1 at a

27  neutral location and searched CS1's person and his/her vehicle for contraband with

28  negative results.  In the presence of TFO Slocombe, CS1 made several telephone

PLEA AGREEMENT - 6

1   calls to Defendant to purchase one pound of methamphetamine. Defendant did not

2   immediately answer these calls. However, a few minutes later, CS1 received a

3   telephone call from Defendant who explained that he had been outside with a

4   neighbor and unable to answer the calls.[1] While on the telephone with Defendant,

5   CS1 asked for "una" or one pound of methamphetamine. Defendant told CS1 to

6   give him 10 to 15 minutes and that they could then meet at a storage unit[2]. CS1

7   was provided recording device and official advance funds to purchase the

8   methamphetamine from Defendant.

9       CS1 was followed to the storage unit where the audio/video captured

10  Defendant inside the storage unit with the CS1. Defendant removed two packages

11  from within the storage unit and gave them to CS1. CS1 again met with TFO

12  Slocombe and turned over the purchased methamphetamine and recording devices.

13  In a subsequent debrief with CS1, CS1 advised that while inside the storage unit,

14  Defendant took apart a speaker box and removed the methamphetamine from

15  within the speaker box. According to CS1, Defendant then said he had four

16  pounds left. CS1 remained in contact with Defendant .

17      The DEA Drug Laboratory later confirmed that the contents of these two

18  packages contained 441.3 grams of pure methamphetamine. (DEA Exhibit 1)

19      On or about July 1, 2021, TFO Slocombe met with CS1 to follow up on a

20  previous conversation between CS1 and Defendant that had occurred under my

21  direction. During this conversation, CS1 advised that Defendant said he had

22  access to cocaine and methamphetamine through another source. CS1 and

23  Defendant referred to this other source of supply as the "brother-in-law." TFO

24

25  [1] TCMDTF Detective Calvin Nash, who was assigned to watch Defendant's

26  residence during the period of these phone calls, confirmed that he had seen
    Defendant outside talking with another person.

27  [2] Based upon prior conversations with CS1, the storage unit referenced by

28  Defendant was a storage unit at 124 South 28th Avenue in Pasco, Washington.

PLEA AGREEMENT - 7

1 Slocombe later identified the "brother-in-law" as Co-Defendant Josimar

2 ESPINOZA Barajas (ESPINOZA). During this meeting, CS1, at TFO Slocombe's

3 request, called Defendant to see if he had methamphetamine available for sale.

4 Defendant stated that he was working and that he would need to coordinate with

5 ESPINOZA to bring the methamphetamine if CS1 were to make a purchase. CS1

6 ended the call with Defendant with the understanding that there would be a follow

7 up telephone call to confirm the details of a potential delivery.

8      CONTROLLED BUY TWO

9      On or about July 7, 2021, TFO Slocombe coordinated with CS1 to attempt

10 another purchase of methamphetamine from Defendant. SA Deitering and TFO

11 Slocombe met CS1 at a neutral location and searched CS1's person and his/her

12 vehicle for contraband with negative results. In their presence, CS1 made several

13 telephone calls to Defendant to discuss the purchase of one pound of

14 methamphetamine. During one of these calls, Defendant told CS1 that he was on

15 his way to Pasco. CS1 then told Defendant, using coded language, that he needed

16 one for his friend. CS1 then asked if the meeting location would be the same

17 storage unit as before, to which Defendant responded in the affirmative.

18      CS1 was provided with official advance funds to purchase the

19 methamphetamine from Defendant as well as recording devices. CS1 was followed

20 to the buy location where agents observed CS1 enter the same storage unit that was

21 involved in the May 2021 controlled buy. Defendant was already waiting at the

22 storage unit. The audio/video devices were successful in capturing only audio of

23 the interaction between CS1 and Defendant on this occasion. However, SA Wood,

24 who was conducting surveillance, was able to video tape the arrival of Defendant

25 as he entered the storage unit.

26      During this second controlled buy, TCMDTF Detective Miguel Ayala was

27 tasked with surveillance of Defendant's residence. After CS1 called Defendant to

28 confirm the delivery of methamphetamine, Detective Ayala saw a Mazda sedan

PLEA AGREEMENT - 8

1  with Washington State license plate BCM9548 leave the area of Defendant's
2  apartment complex at approximately 5:18 p.m.  SA Wood observed the same
3  Mazda sedan enter the storage unit complex only minutes after it left the parking
4  lot of Defendant's residence.

5      After Defendant delivered methamphetamine to CS1 while at the storage
6  unit, SA Wood observed Defendant, ESPINOZA, and CS1 leave the storage unit
7  complex in their respective vehicles.  SA Wood confirmed it was ESPINOZA
8  driving the Mazda.  TFO Slocombe and SA Deitering followed CS1 back to a
9  neutral location from the storage unit where they took possession of the
10 methamphetamine and the recording devices.

11      During a debrief of CS1 after this second controlled buy, CS1 confirmed that
12 Defendant was already at the storage unit when CS1 arrived.  CS1 further
13 confirmed that there was a second vehicle there as well and that ESPINOZA
14 walked from the Mazda with the methamphetamine in a single package that
15 ESPINOZA then provided to Defendant, who in turn provided it to CS1 in
16 exchange for the official advance funds.

17      Surveillance units followed the Mazda from the buy location, and eventually
18 back to Defendant's apartment complex.  At the time of this controlled buy, law
19 enforcement had yet to identify ESPINOZA by name but later confirmed
20 ESPINOZA's identity.

21      The DEA Drug Laboratory later confirmed that the contents of the package
22 obtained during this second controlled buy contained 445.9 grams of pure
23 methamphetamine (DEA Exhibit 2).

24      CONTROLLED BUY THREE

25      To further this investigation, on or about March 3, 2022, CS1 was again
26 instructed to contact Defendant by telephone and arranged to buy one pound of
27 methamphetamine the next day.  Based on telephone calls between CS1 and
28 Defendant, CS1 understood that Defendant would be contacting ESPINOZA who

PLEA AGREEMENT - 9

1  would be responsible for making the actual delivery.

2  On or about March 4, 2022, under my direction, CS1 contacted Defendant.

3  Over the course of several calls, Defendant confirmed that ESPINOZA would

4  deliver one pound of methamphetamine to CS1 at ESPINOZA's residence at 522

5  Road 34, Pasco, Washington. To facilitate this controlled buy, SA Deitering and

6  TFO Slocombe met CS1 at a neutral location and searched CS1's person and

7  his/her vehicle, with negative results. CS1 was provided with official advance

8  funds and recording devices. The surveillance team followed CS1 to the buy

9  location.

10  Video taken of this third controlled buy captured ESPINOZA as he exited

11  522 Road 34, Pasco, Washington and contacted CS1 while CS1 was parked in the

12  driveway. During this encounter, ESPINOZA told CS1 that the source (of the

13  methamphetamine) would be arriving shortly. Minutes later, video captured the

14  arrival of the source of supply, later identified as Co-Defendant, Andres

15  MENDOZA (MENDOZA), who arrived in a blue 1984 Chevrolet Monte Carlo.

16  Upon arrival, MENDOZA parked in the same driveway just behind CS1 and

17  accessed the trunk of the blue Monte Carlo and retrieved a white bag from the

18  trunk. MENDOZA then walked past CS1 without making contact and entered

19  ESPINOZA's residence. Video also captured ESPINOZA exit the residence and

20  provide CS1 with the same bag that MENDOZA had retrieved from his trunk.

21  The DEA Drug Laboratory later confirmed that the contents of the package

22  obtained during this third controlled buy contained 439 grams of pure

23  methamphetamine. (Exhibit 3)

24  MENDOZA's identity was unknown at the time of the third controlled buy;

25  however, his identity was confirmed shortly thereafter with the assistance of Pasco

26  Police Officer Jeremy Jones, who initiated a traffic stop at my request of

27  MENDOZA. During this traffic stop, MENDOZA provided his Washington State

28  driver's license.

PLEA AGREEMENT - 10

1    On or about August 16, 2022, TCMDTF Detective Eddie Magana and TFO

2  Slocombe met with a second confidential source (hereafter CS2) who advised that

3  they knew MENDOZA and knew him to be engaged in ongoing drug distribution.

4  CS2 was a gang member.  When CS2 was signed up as a confidential source for

5  the TCMDTF, CS2 stated that while he/she was no longer involved with any gang,

6  CS2 did have friends that were involved in gangs and drug distribution.  Based on

7  this information, a meeting between CS2 and MENDOZA was arranged.

8    On or about August 16, 2022, Detective Magana and TFO Slocombe met

9  with CS2 to discuss a July 22, 2022 meeting that occurred between CS2 and

10  MENDOZA.  This meeting was not recorded.  According to CS2, MENDOZA

11  talked about selling crystal methamphetamine, fentanyl pills (e.g., blue pills

12  marked with M30 suspected to contain fentanyl) and "yey" (i.e., street name for

13  cocaine).  During this same meeting, CS2 advised MENDOZA showed CS2

14  smaller amounts of cocaine packaged for sale.  CS2 then asked MENDOZA about

15  current prices.  According to CS2, MENDOZA explained he had crystal

16  methamphetamine available for $1700 a pound, fentanyl pills available for $3000 a

17  boat (i.e., "boat" is slang for 1000 fentanyl pills), and cocaine for $900 an ounce.

18    On or about August 19, 2022, under DEA direction and in TFO Slocombe's

19  presence, CS1 telephoned Defendant.  This telephone call, and a subsequent call,

20  confirmed that Defendant's drug trafficking activities, along with those of his

21  associates, remained ongoing.  During the first telephone call, CS1 called

22  Defendant and asked if the "brother-in-law" (i.e., ESPINOZA) had any of "that"

23  for sale.  CS1 and Defendant conversed using code words or phrases.  Defendant

24  responded that he would call to confirm availability and current price.

25  Approximately 10 minutes later, Defendant called CS1 and stated that ESPINOZA

26  had "good stuff" for sale, that the price was $2,300 a pound, and that the price

27  might go down if CS1 needed more than one pound.  Because CS1 was not

28  purchasing methamphetamine at that time, no location was set for the delivery.

PLEA AGREEMENT - 11

1    **ARRESTS OF DEFENDANT, ESPINOZA, AND MENDOZA**

2    On September 9, 2022, TFO Slocombe applied for, and obtained search

3    warrants associated with this investigation. See 4:22-mj-07142 ACE, 4:22-mj-

4    07144 ACE, and 4:22-mj-07145 ACE. On July 6, 2022, this Indictment was

5    obtained against MENDOZA, Josimar Espinoza Barajas, and Defendant.

6    On September 14, 2022, just after 6:00 AM, DEA agents, along with

7    Detectives with the TCMDTF executed the search warrant at Defendant's

8    residence (30 North Sheppard Pl, Apt. 7, in Kennewick Washington). ESPINOZA

9    and Defendant were both located and arrested. Agents located and seized the

10   following from the residence: (1) N-103- a Diamondback LLC AR15 semi-

11   automatic carbine (rifle); (2) N-104- $4,900 cash currency (3) N-105- a Mossberg

12   Model 835 12 gauge shotgun and several cellular phones (no narcotics were

13   found).

14   At 7:06 AM, TFA Pitts and TFO Slocombe advised Defendant of his

15   Miranda rights, to which he waived and agreed to be interviewed. Defendant

16   admitted that he had stored and sold methamphetamine, and that he had profited

17   from the sale of methamphetamine.

18   After the Defendant's arrest, search warrants were obtained for all the cell

19   phones seized. The search of the cell phone did provide corroboration as to

20   Defendant's involvement tin drug trafficking. Moreover, several cooperating

21   Defendants have come forward who identified Defendant as being involved in the

22   distribution of pound quantities of methamphetamine and other controlled

23   substances.

24   8.    The United States' Agreements

25   The United States Attorney's Office for the Eastern District of Washington

26   agrees that at the time of sentencing, the United States will move to dismiss Counts

27   1 and 2 of the Indictment, which charge Defendant with Distribution of 50 grams

28   or more of Methamphetamine.

PLEA AGREEMENT - 12

1    The United States Attorney's Office for the Eastern District of Washington

2    agrees not to bring additional charges against Defendant based on information in

3    its possession at the time of this Plea Agreement that arise from conduct that is

4    either charged in the Indictment or identified in discovery produced in this case,

5    unless Defendant breaches this Plea Agreement before sentencing.

6        9.    <u>United States Sentencing Guidelines Calculations</u>

7        Defendant understands and acknowledges that the United States Sentencing

8    Guidelines ("U.S.S.G." or "Guidelines") apply and that the Court will determine

9    Defendant's advisory range at the time of sentencing, pursuant to the Guidelines.

10   The United States and Defendant agree to the following Guidelines calculations.

11       a.    <u>Base Offense Level and Application of Relevant Conduct:</u>

12       The United States and the Defendant agree that the Defendant distributed

13   and possessed with the intent to distribute, at least 1.5 but less than 5 kilograms of

14   actual (pure) methamphetamine and that this amount properly accounts for his

15   relevant conduct during the investigation. Therefore, the parties agree and

16   stipulate his base offense level is 32. U.S.S.G. § 2D1.1(c)(4).

17       b.    <u>Special Offense Characteristics:</u>

18       The United Sates will argue two additional points should be applied based

19   upon Defendant's possession of firearms connected to the offense. U.S.S.G.

20   §2D1.1(b)(1). Defendant is free to argue this application.

21       Depending on the Court's determination of the weapons enhancement, the

22   parties further agree the Defendant may be eligible for the safety valve provisions

23   of 18 U.S.C. § 3553(f) and USSG §5C1.2 or under the First Step Act.

24       c.    <u>Role Adjustments:</u>

25       The United States and Defendant agree that no role adjustment should be

26   applied.

27       d.    <u>Acceptance of Responsibility</u>

28       The United States will recommend that Defendant receive a three-level

PLEA AGREEMENT - 13

downward adjustment for acceptance of responsibility, pursuant to U.S.S.G.

§ 3E1.1(a), (b), if Defendant does the following:

     i.     accepts this Plea Agreement;

     ii.     enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

     iii.     demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

     iv.     provides complete and accurate information during the sentencing process; and

     v.     does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

     e.    <u>No Other Agreements</u>

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

     f.    <u>Criminal History</u>

The United States and Defendant have no agreement and make no representations about Defendant's criminal history category, which will be determined by the Court after the United States Probation Office prepares and discloses a Presentence Investigative Report.

PLEA AGREEMENT - 14

10. <u>Incarceration</u>

The United States and Defendant are free to argue for any lawful sentence.

11. <u>Supervised Release</u>

The United States and Defendant each agree to recommend 5 years of supervised release. Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

  a. The United States Probation Officer may conduct, upon reasonable suspicion, and with or without notice, a search of Defendant's person, residences, offices, vehicles, belongings, and areas under Defendant's exclusive or joint control.

  b. Defendant shall participate and complete such drug testing and drug treatment programs as the Probation Officer directs.

  c. Defendant shall complete mental health evaluations and treatment, including taking medications prescribed by the treatment provider. Defendant shall allow reciprocal release of information between the Probation Officer and the treatment provider. Defendant shall contribute to the cost of treatment according to the Defendant's ability.

12. <u>Administrative Forfeiture:</u>

Defendant, ANTONIO ZAMORA-ZARAZOGA, agrees to voluntarily forfeit and relinquish all right, title and interest he has in the following listed assets

PLEA AGREEMENT - 15

to the United States Drug Enforcement Administration (DEA):

- $4,900.00 U.S. currency;

- Diamondback Arms Inc. DB-15 5.56mm Caliber Rifle bearing serial number DB2446323, with Survival Land Scope and (2) MagPul AR-15 Magazines and 50 rounds 5.56mm Caliber NATO Ammunition; and,

- Mossberg 835 12-Gauge Shotgun bearing serial number UM12564

Defendant acknowledges that the firearms, ammunition, and accessories are subject to forfeiture to the United States pursuant to 21 U.S.C. § 853 and/or 21 U.S.C. § 881, as facilitating property and/or as property constituting proceeds obtained directly or indirectly from violation(s) of 21 U.S.C. § 841.

Defendant agrees not to contest the forfeiture of the above-listed assets in any administrative forfeiture proceedings initiated against said assets by DEA, and hereby agrees to execute any and all forms, documents, and pleadings, if necessary, to effectuate the forfeiture of the assets. Defendant consents to the forfeiture of said assets without further notice of forfeiture proceedings.

Defendant agrees to hold all law enforcement agents and the United States, its agents, and its employees harmless from any claims whatsoever arising in connection with the seizure, forfeiture, destruction or return to lawful owner, of any assets covered by this agreement.

13. Criminal Fine

The United States and Defendant may make any recommendation concerning the imposition of a criminal fine.  Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

14. Mandatory Special Penalty Assessment

Defendant agrees to pay the $100 mandatory special penalty assessment to

PLEA AGREEMENT - 16

1 the Clerk of Court for the Eastern District of Washington, pursuant to 18 U.S.C.

2 § 3013.

3      15.   Underline Payments While Incarcerated

4      If Defendant lacks the financial resources to pay the monetary obligations

5 imposed by the Court, Defendant agrees to earn money toward these obligations by

6 participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

7      16.   Additional Violations of Law Can Void Plea Agreement

8      The United States and Defendant agree that the United States may, at its

9 option and upon written notice to the Defendant, withdraw from this Plea

10 Agreement or modify its sentencing recommendation if, prior to the imposition of

11 sentence, Defendant is charged with or convicted of any criminal offense or tests

12 positive for any controlled substance.

13      17.   Waiver of Appeal Rights

14      Defendant understands that Defendant has a limited right to appeal or

15 challenge Defendant's conviction and the sentence imposed by the Court.

16      Defendant expressly waives all of Defendant's rights to appeal Defendant's

17 conviction and the sentence the Court imposes.

18      Defendant expressly waives Defendant's right to appeal any fine, term of

19 supervised release, or restitution order imposed by the Court.

20      Defendant expressly waives the right to file any post-conviction motion

21 attacking Defendant's conviction and sentence, including a motion pursuant to 28

22 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from

23 information not now known by Defendant and which, in the exercise of due

24 diligence, Defendant could not know by the time the Court imposes sentence.

25      Nothing in this Plea Agreement shall preclude the United States from

26 opposing any post-conviction motion for a reduction of sentence or other attack

27 upon the conviction or sentence, including, but not limited to, writ of habeas

28 corpus proceedings brought pursuant to 28 U.S.C. § 2255.

PLEA AGREEMENT - 17

1     18.    <u>Withdrawal or Vacatur of Defendant's Plea</u>

2     Should Defendant successfully move to withdraw from this Plea Agreement

3  or should Defendant's conviction be set aside, vacated, reversed, or dismissed

4  under any circumstance, then:

5         a.    this Plea Agreement shall become null and void;

6         b.    the United States may prosecute Defendant on all available

7              charges;

8         c.    The United States may reinstate any counts that have been

9              dismissed, have been superseded by the filing of another

10           charging instrument, or were not charged because of this Plea

11           Agreement; and

12         d.    the United States may file any new charges that would

13           otherwise be barred by this Plea Agreement.

14     The decision to pursue any or all of these options is solely in the discretion

15  of the United States Attorney's Office.

16     Defendant agrees to waive any objections, motions, and defenses Defendant

17  might have to the United States' decision about how to proceed, including a claim

18  that the United States has violated Double Jeopardy.

19     Defendant agrees not to raise any objections based on the passage of time,

20  including but not limited to, alleged violations of any statutes of limitation or any

21  objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth

22  Amendment.

23     19.    <u>Waiver of Attorney Fees and Costs</u>

24     Defendant agrees to waive all rights Defendant may have under the "Hyde

25  Amendment," Section 617, P.L. 105- 119 (Nov. 26, 1997), to recover attorneys'

26  fees or other litigation expenses in connection with the investigation and

27  prosecution of all charges in the above-captioned matter and of any related

28  allegations (including, without limitation, any charges to be dismissed pursuant to

PLEA AGREEMENT - 18

1   this Plea Agreement or any charges previously dismissed or not brought as a result
2   of this Plea Agreement).
3       20.   <u>Integration Clause</u>
4       The United States and Defendant acknowledge that this document
5   constitutes the entire Plea Agreement between the United States and Defendant,
6   and no other promises, agreements, or conditions exist between the United States
7   and Defendant concerning the resolution of the case.
8       This Plea Agreement is binding only on the United States Attorney's Office
9   for the Eastern District of Washington, and cannot bind other federal, state, or local
10  authorities.
11      The United States and Defendant agree that this Agreement cannot be
12  modified except in a writing that is signed by the United States and Defendant.
13
14                    <u>Approvals and Signatures</u>
15      Agreed and submitted on behalf of the United States Attorney's Office for
16  the Eastern District of Washington.
17  Vanessa R. Waldref
18  United States Attorney
19
20  Stephanie Van Marter                    5/18/23
21  Assistant United States Attorney         Date
22
23      I have read this Plea Agreement and I have carefully reviewed and discussed
24  every part of this Plea Agreement with my attorney.  I understand the terms of this
25  Plea Agreement.  I enter into this Plea Agreement knowingly, intelligently, and
26  voluntarily.  I have consulted with my attorney about my rights, I understand those
27  rights, and I am satisfied with the representation of my attorney in this case.  No
28  other promises or inducements have been made to me, other than those contained
    PLEA AGREEMENT - 19

in this Plea Agreement.  No one has threatened or forced me in any way to enter into this Plea Agreement.  I agree to plead guilty because I am guilty.


Antonio Zamora                          5-18-23
ANTONIO ZAMORA-ZARAZOGA              Date
Defendant

     I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties.  I concur in my client's decision to plead guilty as set forth in the Plea Agreement.  There is no legal reason why the Court should not accept Defendant's guilty plea.


_____          5/18/23
Craig Webster                         Date
Attorney for Defendant



_____ Javiala Gutierrez
              Interpreter

PLEA AGREEMENT - 20